May I please the court, Van Arvanites on behalf of Ms. Tammy Halling, I represent Ms. Halling as an assistant federal defender from the District of Montana, Great Falls Division, and I want to thank you for allowing me to visit this court for this argument. As an overview, Ms. Halling was sentenced to, as the court is aware, 1,320 months, about 110 years, and Ms. Halling was charged and convicted at a bench trial of four counts. Three counts of sexually explicit conduct, or sexual exploitation of children rather, and one count of distribution of child pornography. And what pretty much our only defense when Ms. Halling decided not to plead guilty concerns the definition of sexual explicit conduct under 2256, and whether her conduct, as proven at the bench trial, encompassed, I guess, that definition. Certainly, as the court is aware, within the transcript of the bench trial, Mr. Huff's client, Amber Halling, was very much involved in many of the shows, in all of the shows. I mean, you know, she was the typist on at least a couple of occasions. She watched other performances. She gave an okay for her daughter to engage in performances. She was a participant herself in at least one of the peanut butter incidents. The shows took place in her house, on her computer, and using her PayPal account. So she was very much involved. She had a role, certainly. And I think if, for instance, one of the shows concerning the juvenile Jessica, J.R., it concerned peanut butter, a lot of peanut butter, which was put on Ms. Tammy's breasts. And then the two girls licked it off on this webcam. It's not like it's just squarely within any possible interpretation. That's pretty bad conduct. But if we look at the definition of this sexually explicit conduct actually simulated, sexual intercourse, licking peanut butter off breasts, is not sexual intercourse. I don't think it's bestiality. I don't think it's masturbation. It's not sadistic or masochistic conduct or lascivious exhibition of genitals. It's contact. It sure is contact. And it could have been charged as perhaps under sexual abuse. And wasn't there also – I was looking for the transcript reference and didn't find it. But it seemed to me there was also simulated oral sex. Well, and it may be to your benefit that you couldn't find the transcript. Because the – unfortunately, when you're dealing with children, as this Court knows, in trials, things go back and forth quite a bit. That's clearly sexual conduct within the definition, correct? That is correct. And my memory of it may be inaccurate, but it seemed to me that there was a statement of this had happened several times, but no more than 11 times or something like that. There was actually a specific number of times that that was described as having occurred. Yes, and that occurred with Amber Holling, who is an adult, Mr. Huff's client, not my client. There was an occasion in the transcript 38, ER 38, within the transcript page 39, where there was an occasion at the second show where Tammy was typing. And the girl, Jessica, said that Amber tried to simulate sexual conduct, but she said no. She stopped. Which is very similar to what her daughter, Mia, did when Judge Reimer talked about the acquiescence, the giving permission when she went up to sleep. That was between Amber and Mia, and her mother said, if you don't feel comfortable, say stop. Basically, they blamed each other. And, I mean, that's – as the neutral reader, I come in here and I see your clients doing, you know, this. It was her fault. It was her fault. But I don't understand why there isn't sufficient evidence that they were a plague on both their houses. I'm really mixing metaphors. I apologize for that. But it seemed to me that, to some extent, they were both credible and both not credible, and I don't understand why it wasn't possible to just believe that they had both been participants from what the evidence was, particularly your client was the money end of the thing for all of these events, not just the ones where she was admitting to being awake and present. And right, because, as Mia states, Amber didn't have a driver's license, and that's why she couldn't get a PayPal account. But the record is clear that when Ms. Hurd asked Mia, or asked Jessica, rather, whether my client paid her, she said, well, she gave me $20 one time, but that was for cleaning the house. And, in fact, she later says on page 40, page ER40, transcript 48, that it was actually Amber, Mr. Huff's client, who offered her $10 for doing the show, and she declined it. So whatever – I mean, so, again, you go back to this element of employed, used, enticed, coerced. And even though this conduct is reprehensible, it doesn't fall within the definition of that element and within the definition of explicit sexual contact as well. Again, both these women had tough lives, and that's no excuse. And certainly the borders, the boundaries were poor. She was a very poor mother figure. I don't understand why the peanut butter episode isn't sexual contact. Well, because under the definition of explicit sexual conduct under 2256, which is a key element in this account, again, simulated or actual, sexual intercourse, bestiality, masturbation, sadistic abuse, lascivious exhibition of genitals or pubic area. Call it a loophole, if you will, but fondling the breasts is something else. It's sexual – it's maybe sexual battery because of the age of the girls between 16 and 12. But it doesn't fall within this definition. So I guess if Ms. Hurd charged it as sexual battery, certainly I wouldn't have a real issue here. If there are no other questions, I will sit down. Thank you. Thank you. Thank you. May it please the Court, my name is Andrew Huff. I am the attorney for Amber Holling. Amber is Tammy's daughter, and it is probably no surprise to this Court that I have a substantially different understanding of events than has been relayed to you by Tammy's attorney this morning. My appeal is basically there are three parts to it. One, that there are technical errors made in the application of the guidelines. Number two, that the district court made errors in its assessment of the 3553A factors and that these were egregious enough to amount to procedural unreasonableness. And the last part of my argument is that given the characteristics of the offense and the defendant, that the sentence of 260 months is so outside the boundaries of what is rationally related to the crime that it amounts to cruel and unusual punishment. Before I get into that, I would like to just briefly bring the Court back to the global view of this case. You are right in your observations that the two defendants are pointing their fingers at each other. But the evidence here clearly indicates, first of all, that Tammy Holling, Amber's mother, was involved in deviant sexual activities long before Amber was ever in the house. She had the webcam set up. She had the PayPal account set up. And it was also Tammy's idea to involve the two 13-year-old children. Well, her idea or not, it seemed to me there was plenty of evidence that your client was involved in the activity and she was of majority age at the time. That's correct, Your Honor. And she took full responsibility for that both at her change of plea hearing, at her sentencing, and she testified against Tammy during the trial. She never tried to evade her responsibility in any way, which is more than can be said for Tammy Holling, who to this day has continually attempted to evade her responsibility for this. The thing to keep in mind is that Tammy is the mother here. This is her house, her computer. The evidence indicated that Tammy actively trolled the Internet looking for basically predators to peddle her own children to and a 13-year-old child. She did actively participate. She was in the peanut butter show. I don't think there's anything more sexual contact by any definition in my opinion. And the evidence also indicated that Amber couldn't get a job because she was absconding from probation. And Tammy basically said to her, you need to pay your way here. And this was what her option was. And ultimately it was Tammy who profited. Tammy made hundreds of dollars in the course of about ten days on these activities. So the other thing to keep in mind is that Amber's life up to that point had been kind of a hair-raising experience with abuse, exploitation, violent sexual and physical abuse.  She'd been abused essentially since she was about two years old onward. Evidence of rape, evidence of severe beatings. She was diagnosed by the federal forensic psychologist as having rapid cycling bipolar disorder. In my conversation with previous doctors who had evaluated her, one said that it was the worst case of post-traumatic stress syndrome he'd ever dealt with in a child. So she had a long history. All of those things present an obviously sympathetic, disturbed background. But the district court, recognizing those aspects of her history, nevertheless found that she was a willing participant. And she'd earned a profit. And her history of abuse and mental illness played no role in her offense. So while the district judge might have given more credit in a way to the childhood abuse, why did it have to? I think it had to because in order to understand this defendant, in order to balance those 3553A factors, and because I, as her defense attorney, put it before the court as a major issue here, that was enough to require the court to give substantial consideration to those issues. And if you read the transcript of the sentence saying the court pretty much blows it off. He says that he rejects, the court rejects, any contention that these background factors don't mitigate or that they absolve her of responsibility. Well, as you just said, I read it and the district court said, yeah, but she is fully accountable for her conduct, something which she obviously, in fact, admitted herself. Yes. And the evidence wasn't introduced as a way to absolve her of her own responsibility. She took responsibility. She took full responsibility for her actions. It was a way, it was introduced so that the court could understand the defendant. A normal 19-year-old person would have tried to extract herself from this situation. Amber, by the time these events had happened, had known nothing but abuse, exploitation, serious violence, was on drugs. She wasn't a normal 19-year-old. And her mother was responsible for a good majority of her abuse throughout her life. So when you have a situation with the mother controlling the household and the daughter being there having been invited up there by the mother and then getting involved in this situation, it's understandable that Amber wouldn't just have run away like a normal person. This was just another episode in a long history of abuse and exploitation. The difference here is that at the time this episode occurred, she was 19 and not 17. You know, it's interesting that you say, you know, I don't pretend to understand the psychology behind this, but your client got up there and said to the court, I don't blame my childhood. I don't blame my mother. I blame myself for having continued this activity. And why can't the court take her at her word to say that she's not blaming others, she's not saying that she has no responsibility? Well, I think the reason is that the court, the function of the court, is to take a global look at these issues. Amber was 19 years old. She was a child, basically, legally an adult. But then I guess my problem is the court then says, I'm looking at ER 158, I've determined from the record, and particularly from the defendant's own declaration, and so he's believing her. So I guess now you're saying, well, he shouldn't have believed my client? No, no, I'm saying that he is confusing Amber, accepting responsibility for her conduct and his role to understand the defendant and why she may have committed. And you don't think we should take the court at its word when he says that he's considered the defendant's history and her characteristics and what's happened to her? I think the record he made is insufficient because the record is so vast. And there was direct testimony by a U.S. probation officer and a second witness confirming all of this abuse. And the U.S. probation officer said, I went through accordion files on this family of abuse, accordion files, that there was an obligation to take that into account and to spend some time balancing that against other factors here. Did the mother say, either you go to work and be in these shows, otherwise you're not going to have a place to live? I don't know if she said those words, but that was Amber's understanding, that basically it was do those shows or she had to move on. So the so-called profit was $10 plus living in her mother's house. Right. It was kind of in exchange for room and board. And the fact that her sentence was about something like one-sixth as long as her mother's, don't you think that that's partly because the district court took into account the extra responsibility that the parent had? I think that's correct. I would agree that the proportional sentences, that's the one thing I agree with in this sentence, that they are proportionally correct and reflect the different amounts of culpability as between the two co-defendants. I just think they're both vastly too long given the actual conduct here. I just want to really quickly go into the guidelines arguments. There's one principally that I'm concerned with, although I made several. Basically, in the guidelines calculations, there were some under 2G21 a provision for the use of a computer in the crime. There was also use of guideline provisions under 2G2.2, another provision dealing with the use of a computer in a sex crime. However, the two provisions are for different statutory crimes. The correct one is 2.1, that's for 2251, exploitation. The second one, 2.2, is for trafficking. It's not for the same crime. And yet, it was used in both counts to up the guidelines calculation. Isn't that a typo? It's not, Your Honor. If you look at the government's own brief on page 8, you get it very nicely laid out. I'm sorry, not page 8, page 7. You see the full set of groupings here, group 1, group 2. You get the entire guidelines calculation. Then you see 2G2.1 all the way down, all the way down until you get 2G2.2, use of a computer. And the second one, 2G2.2, use of a computer on page 8. There it is in black and white. It's not a typo. It's clearly a mistake, and it clearly runs afoul of Ninth Circuit law in U.S. v. Archdale, which says, and I think it's on point, impermissible double counting occurs where one part of the guidelines  has already been fully accounted for by the application of another part of the guidelines. That's squarely on point here. It's not a typo, and it's right there in the government's brief. The other guideline, there are several guideline provisions. I may be reading the guidelines wrong, because I admit they're a little bit arcane to me, but there was another enhancement due to the grouping of the factors. Now, as I read 3D1.2, which is page 338 of the guidelines manual, it says that specifically excluded from the operation of this subsection, which is the grouping subsection, is offenses committed under 2G2.1. So I think that's plain error. I also objected on some other grounds, the primary one of which is that the base level 32, the starting level of the offense, incorporates the age of the victims, and that the enhancements are basically stacking up. Excuse me, already incorporated in the base. Why isn't the harm that they address different? What's that? Why isn't the harm each addresses different? Well, I think the harm is the same, because in order to get into that guidelines provision, you actually have to commit an offense against a minor. That's the only reason you can get into that guidelines provision. So further provisions for additional punishment, because you've committed a harm against a minor in the same guidelines provision, it's the same exact thing. But aren't they grading it by how young the victims are? It's considered more harmful, worse, more punishable. I think they are. I think it's a guidelines kind of legislative judgment, but it's not a judgment that's made in the statute. And by making the judgment in the guidelines, what you're doing is, I think, engaging in legislation. If there had been some sort of desire to make those kinds of gradations, it should have been done in the statute, not in the guidelines. So by the guidelines doing it, you're just stacking things up in an unreasonable way, Your Honor. Mr. Huff, you're over time, so if you'd like to just wrap up. Thank you. I'll reserve the rest of my time for rebuttal. You're a minute over already. You're over. Sorry. For the record, Your Honors, again, my name is Marcia Hurd, and I'm with the District of Montana, and I'm here on behalf of the United States. I have to say, in 17 years of prosecuting sex cases, this had to be one of the most unusual that I have ever handled. Dealing first with Tammy Howling and Tammy's arguments about sufficiency of the evidence, when you look at this entire excerpt of record and the trial transcript, there are numerous places within there where Amber, the first minor, J, and the second minor, M, as well as an eyewitness, identify Tammy Howling as being involved in one way or another in these shows. If you look at first starting with the eyewitness, who actually was the 13-year-old girl who had enough courage to come forward because she saw something she thought was wrong, she identifies on excerpts of record, page 32, that Amber was involved in various sexual activities with the second girl, M, and that the two of them, Amber and M, had asked Tammy if they could do the show, and that she had given them permission. If you look at the testimony, trial testimony, from the first girl, first 13-year-old girl, J, again, excerpts of record 34, she talks about she became involved because Amber had asked her, but then Tammy was typing, and Judge Graber is right. There is a specific reference on ER 36 where J reports that Tammy was typing and she was simulating oral sex, as was Amber. The peanut butter show, even if you disregard any comment about whether the peanut butter show was sexually explicit or sexual conduct or not, that same show, both Amber and J reported involved oral sex and involved various sexual toys, and so you can disregard the peanut butter completely if you want to. That was a show that Tammy was typing for. But it was simulated. Absolutely, and that's permitted under the statutes. Actual or simulated. It specifies that through clothing counts, too, doesn't it? Exactly. It does not need to be actual contact. The statute specifically says it can be actual or simulated and has all these various types of activity. J's testimony goes through, you know, her entire testimony that Tammy was typing on, like she said, like three times where she and Amber were involved in this simulated sexual activity. M, the second girl, again, her testimony is replete from excerpts of record 42 through 49 about the simulated sex and that Tammy gave permission for her to be in the show, that Amber simulated oral sex on her with her shorts off, that the show was 23 to 25 minutes long, that Tammy was there for about the first 20 minutes of it. She absolutely gave her permission and that she knew it was going to be a sex show. Nicely enough, she also gave her permission to say when she was uncomfortable she could stop. So there are just a sufficiency of evidence argument here with regard to Tammy Howling. You have to read the entire transcript to see what her involvement was, and I think the court is absolutely accurate. She was providing the computer. She was providing the residence. She was the typist for some of these shows. She was a participant in terms of the peanut butter show, although she denies in her own testimony at trial that it was her that was involved in the peanut butter show. She said that was Amber and she was just typing. Everybody else who was there said nope, it was her, and she was the one who was unclothed and had the peanut butter. Her PayPal account, it was her computer, and she was the parent of both of these children. Amber is not a child. I would call her an alleged adult because she certainly is over the age of majority, but her own child, her other child, was 13 years of age, and she gave her specific permission to be in what she knew was going to be a sexually explicit show, and that's why there is just, when you read the entire transcript, there's no way to say that there was not sufficient evidence to, with regard to Tammy, to say that she participated in these shows or that she had a minor assist or that she knowingly permitted that minor to assist in sexually explicit conduct because the trial testimony from all the people who testified, except for Tammy, was clear that she did. Are there any other questions on Tammy's arguments before I move to Amber? And where does the simulated word appear in the statute? If you look at 2256, I believe it is, it says actual or simulated, and I believe there's a number of specific types of activity. Okay. I'll find it. Thank you. Okay. I have a question on Amber's arguments about grouping. Would you respond to the argument about grouping? I will, Your Honor. The argument about grouping, I'm not quite sure that it was raised in the brief. Well, that's what I was wondering, too, because I was struggling to follow that. It seemed to me that the stacking is different than grouping. Absolutely. And stacking is definitely raised in the brief, but his argument about grouping that came up today left me a bit puzzled as well. There was no argument in the court below that the guideline calculation was incorrect due to grouping. And so grouping actually works in Amber's favor. It does. Grouping generally always works in a defendant's favor. In this case, his arguments were specifically addressed to various factual findings that the court made and also to his argument that two guidelines had been mixed together and used. And I think it's really clear, and the reason I set it forth in my brief is because that's the way it appeared in the pre-sentence report, that there was 2G2.1 and 2G2.2. But it's clear when you look at the whole pre-sentence report and the statutes, that is a typographical error because, as I noted in my brief, there is no 2G2.2 section that is cited that way. So it is a typo. It's simply something that we all sat and looked at and didn't catch. And he challenges a number of the factual findings, which are, again, he discussed them. Exactly. Okay. I didn't understand the grouping point. I really didn't either, Your Honor. I'm not quite sure if that's just kind of something that he has recently thought about. But it seems to me, if you look at the pre-sentence report in this case, that she benefited from the grouping. And I'm not sure why we'd be arguing now that that was not accurate. I think the court also pointed out the problem with the argument about double counting in that his argument was she shouldn't have gotten enhancement for the age of these two girls because it was already in the base offense level. The problem with that argument is the base offense level presumes any child, from an infant to a child one day short of their 18th birthday. And that's all contained within 2G2.1. And then, as the court has noted, there's a gradation of two levels, an additional for children who are younger, and then more additional levels for kids who are even younger than that. And I think that's because, as the Archdale case says, double counting is allowed when indication of the behavior serves a unique purpose under the guidelines. Now, counsel today argued that that regime of having more and more severity as the child victim becomes younger and younger is improper because it is not in the statute. That, again, wasn't raised. Correct, but do you have off the top of your head a response to it? Well, my off the top of the head response is that's the purpose of the guidelines, is the guidelines are to set forth in their advisory fashion now generally what people in this country think is better or worse, if we could say it that way, about various aspects of a crime. And if we wanted to take that kind of argument that he's making here today for the first time, every single increase and every single decrease would be unconstitutional, according to him. It would have to be in the statute. The statute would have to say if you sexually abuse a child between the ages of 10 and 12, then this is the potential penalty between — it doesn't make sense to me because the point of the guidelines is to give some gradation to what we as people think of either factors favoring the defendant about the crime, lessening the role of responsibility, or think is worse about the crime. And, you know, it's an argument that I just kind of think off the bat doesn't — just doesn't hold weight in terms of what the guidelines are meant to do. The other issue is, of course, now under Booker and all of those cases, the guidelines are advisory. And so the judge can look at those and say, you know, if this child had been 15 and 364 days, I don't really think I'm going to apply that because she's so close to 16 that it doesn't really seem to be appropriate to apply the two-level increase. And so I just don't think that's an argument that can be made under the advisory guideline regime that we have now. He also tried to make some arguments about the district court simply not taking into account Amber's background and history. And it's fair to say if you look at both of these women's pre-sentence reports, they both had pretty abysmal histories. And the court is absolutely correct. There was a ton of finger-pointing at each other in this case about who was really the grown-up and who was really responsible and who could and couldn't do what. The bottom line is, though, for Amber, she could get a job. She could have gotten a job anywhere. She just needed to go take care of her probation violation issues. Using the fact that she's running from a criminal sentence and from a court is not a reason to say, well, then I was forced into this kind of activity. Because the beginning shows were shows Amber did herself, didn't involve a child. She had made some joking comment when Tammy was doing some shows that it would be funny if you could make money off of this. And that was what she was beginning to do herself. So the court's finding that she was a woman. Not much money. Not much money, I think, in the beginning. She had done just a few because she hadn't been there all that long. But she certainly could have gotten a legitimate job. She could have taken care of her probation violation issues. And I think the judge also looked at, quite frankly, the psychological evaluation that was done, where Amber claimed in a brief to the court that she had multiple personalities, and that it must have been one of her other personalities who confessed because she didn't recall that, and that she was going to raise a defense of insanity. So she was committed to the custody of the Bureau of Prisons. And the Bureau of Prisons diagnosed her as a malingerer, and basically didn't believe a number of the things that she said or the items that she endorsed as being psychologically supportable. And so I think the court also looked at that and said, yes, you have had this history. However, it appears that you have malingered about at least some of it. And you yourself said when you pled guilty and at your sentencing that you were a willing participant and that you didn't blame anybody else. You were fully accountable for your own conduct and that you weren't going to blame your childhood for any of that. And that's, I think, rather admirable for a defendant to do. And I think we don't see that very often. But I think in this case it was probably true that she felt like she was going to stand up and say, here's what I did, and here's how I feel like I'm responsible for it, something that Tammy Howling never did. And I think you're right. The court took her at her word, and the record was sufficient about why the court felt the way it did in terms of what the sentence was. What's the definition of profit in these cases? She got $40 and room and board in her mother's house. Right. And that was her version of it. And, of course, Tammy's version was, I never saw the money. I don't know where it went, you know, that kind of thing. I'm talking about Amber. Right. Right. There's not that I'm aware of a specific definition of profit that talks about in these cases. However, in the child pornography context, when you look at what profit is or what a thing of value is, it doesn't have to be money. And so in this case, you know, Amber received money. She also had room and board, a place to live. Tammy drove her around, drove her to the bank and to her various appointments and those kinds of things. So I think it's clear that she did profit, that she was taken care of, although she says now that she feels like she was forced into this. The record is also clear that Amber came up from Texas. And the idea at that time was to get her off of methamphetamine, to get her away from an abusive boyfriend, and she was going to enroll in beauty school. That was the beginning plan between both mother and daughter. And that quickly went by the wayside when both of them figured out that they could make money doing what exactly it was that they did in terms of exploiting M's friend and exploiting M and making money off of that. As a question of profit, does that go to an enhancement or does it go into the general proposition of 3583? It doesn't even – it's not even required under the statute at all. There's no requirement. I couldn't find it. That's why I asked. Right. So that came up when Mr. Huff raised it as saying the court erred in making a factual finding that Amber profited from these activities. He wanted to argue that she didn't profit. But there's no requirement under the statute that anybody make any money to do this. Okay. Any other questions from the panel on either of these women? No, thank you. I would like to, if I may, quickly. Mr. Huff, I wanted to give you a chance to respond because it seemed to me that the grouping argument that you made was a new argument and I wanted to be sure that you had a chance to tell me if it wasn't. Yes, Your Honor. I didn't argue it in my opening brief, but the government raised it in its response brief. And if you look at the way the government talks about it, it adds two points to the guideline range. So if it's supposed to help my client, then it did the opposite because it boosted the points according to. . . I don't understand how that's possible. I, you know, I can. . . The reason that you group is to avoid the full impact of two separate. . . I agree, Your Honor. And I probably read the paragraph from the government's brief about ten times last night trying to figure it out, and I felt I had to say something today just because it appears to me that it boosted the guideline points. So your argument is that the grouping count incorrectly boosted, not that the government's argument that there was no impermissible, well, not the government's argument that grouping made the sexual conduct issue immaterial. That's correct, Your Honor. And that's my understanding from the government's brief. Okay. Thank you. That at least gets me to where your thinking was, so I thank you for that. Thank you.  Thank you, counsel. The matter just argued will be submitted and will. . .
judges: Rymer, Graber, Rhoades